### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

United States of America,                     Case No. 19-cr-272 (NEB/TNL)

               Plaintiff,

v.                                            **REPORT & RECOMMENDATION**

Sequana Cigolo (1), and
Jason Lynndrotti Winston (2),

               Defendants.

Nathan Hoye Nelson, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government);

Kevin W. DeVore, DeVore Law Office, 742 Bielenberg Drive, Suite 110, Woodbury, MN 55125 (for Defendant Cigolo); and

Douglas L. Micko, Assistant Federal Defender, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 (for Defendant Winston).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Sequana Cigolo's ("Cigolo") Motion to Suppress Defendant's Statements, ECF No. 42, and Defendant Jason Lyndrotti Winston's ("Winston") Motion to Suppress Evidence Obtained as a Result of Search and Seizure, ECF No. 33, and Motion to Suppress Statements, Admissions, and Answers, ECF No. 34. These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Nancy

E. Brasel, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Hearings were held on December 13, 2019, and January 16, 2020. ECF Nos. 46, 50. Assistant United States Attorney Nathan Hoye Nelson appeared on behalf of the United States of America (the "Government"). Attorney Kevin W. DeVore appeared on behalf of Cigolo. Assistant Federal Defender Douglas L. Micko appeared on behalf of Winston. Post-hearing briefing is now complete, and these motions are ripe for a determination by the Court.[1]

## II. FINDINGS

Collectively, the Court heard testimony from Sergeant Adam Lepinski with the Minneapolis Police Department; Special Agents Christopher Labno and Joseph Myers with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"); and J.C., Winston's fiancée. The Government offered and the Court received: Exhibit 1, an audio recording of an interview with Cigolo on September 24, 2019; Exhibits 2A, 2B, and 3, audio recordings of an interview with Winston on September 24, 2019; and Exhibit 4, photographs taken during the interview with Winston.[2] Winston offered and the Court received: Exhibits 1, 2, 3, and 4, photographs of Winston's bedroom.[3] Based upon the file and documents

---

[1] This Report & Recommendation is being issued following a series of General Orders issued by the Honorable John R. Tunheim, Chief District Judge of the United States District Court for the District of Minnesota, in connection with the COVID-19 pandemic, *available at* https://www.mnd.uscourts.gov/coronavirus-covid-19-guidance.

[2] The Court will cite to these exhibits as "Gov't Ex." In the future, it would be helpful if each photograph was designated separately either as its own exhibit or with an alpha or numerical delineator, e.g., 4A, 4B, or 4-1, 4-2. The Court refers to the photographs as if they were paginated in the order they were offered.

[3] The Court will cite to these exhibits as "Winston Ex."

contained therein, along with the testimony and exhibits presented, the undersigned Magistrate Judge makes the following findings.

### A.  Shooting of Cigolo's Brother

Sergeant Lepinski has been a licensed peace officer with the City of Minneapolis for over ten years.  Tr. 14:5-9.[4]  Sergeant Lepinski is currently assigned to the Violent Crime Investigations team, which investigates shootings that take place in Minneapolis. Tr. 14:10-17.  Part of Sergeant Lepinski's responsibilities include interviewing witnesses. Tr. 14:18-20.

Cigolo's brother was shot at the end of July 2019.  Tr. 15:17-16:4.  The suspect in the shooting was Cigolo's ex-boyfriend.  Tr. 16:14-17:3.  Cigolo was not a suspect.  Tr. 16:9-11.  Sergeant Lepinski was part of the investigation of the shooting and communicated with Cigolo in connection with that investigation.  Tr. 15:15-17:3.  While Cigolo's ex-boyfriend was arrested approximately one month later, the gun used in the shooting was not recovered.  Tr. 17:4-14.

### B.  Chicago Shootings

Towards the end of September, Sergeant Lepinski was contacted by law enforcement out of Chicago, Illinois, regarding a gun that had been recovered.  Tr. 17:21-24.  Ballistics testing had linked the gun to the shooting Sergeant Lepinski was investigating in Minneapolis.  Tr. 17:24-18:1, 18:12-17.  Chicago law enforcement was investigating the gun in connection with two other shootings.  Tr. 18:5-11.  As part of their

---

[4] The hearing took place over two days, but the transcripts are consecutively paginated for the entirety of the proceedings.  *See* ECF Nos. 62, 63.  The Court collectively cites to these redacted transcripts as "Tr."

investigation, Chicago law enforcement traced the gun and learned that it had been purchased by Cigolo roughly two weeks before her brother was shot.  Tr. 18:18-19:6.

### C. Interview with Cigolo

Given their parallel investigations, both Sergeant Lepinski and Chicago law enforcement were interested in speaking with Cigolo.  Tr. 19:11-22.  On September 24, 2019, Sergeant Lepinski reached out to Cigolo and asked if he could meet with her to discuss the shooting of her brother and "new information [he] had learned regarding the firearm used being purchased by her."  Tr. 20:1-3, 36:18-37:1.  Cigolo suggested they meet at her home.  Tr. 20:7-9.  Four agents from Chicago had driven up to participate in the interview, and Sergeant Lepinski and the agents proceeded to Cigolo's home in unmarked vehicles.  Tr. 20:15-21:1.

They arrived at Cigolo's home around 6:00 p.m.  Tr. 21:8-10.  None of the officers were in uniform.  Tr. 21:2-7, 32:16-33:3.  Sergeant Lepinski testified that they were all carrying their service weapons and his may have been visible.  Tr. 33:4-34:8.  Sergeant Lepinski was also carrying handcuffs, which were in a pouch on his belt.  Tr. 34:9-35:1.  Sergeant Lepinski believed the service weapons of the other officers were covered by clothing.  Tr. 35:2-6.  Each of the officers, including Sergeant Lepinski, was wearing a badge visibly identifying the person as a member of law enforcement.  Tr. 35:8-36:1.

Not all five law-enforcement officers went to the door at once.  Tr. 21:11-15, 38:5-9.  Sergeant Lepinski testified that only three of them approached initially because they "didn't want to appear overwhelming when [Cigolo] came to the door."  Tr. 21:16-19, 38:13-39:10; *see also* Gov't Ex. 1 at 2:28-30.  The officers asked if they could come inside

4

and were invited in by Cigolo and her brother. Tr. 21:22-25. The three officers went in and sat on the couch. Tr. 21:24-25. At this point, one of the Chicago officers asked if Cigolo would mind if the two other Chicago officers joined them in her home, and she welcomed them in as well. Tr. 22:1-10; *see* Gov't Ex. 1 at 2:20-36. The two other officers came in and everyone proceeded to sit in the living room just inside the front door. Tr. 22:10-22. Cigolo was seated on the couch next to Sergeant Lepinski. Tr. 22:23-24. Sergeant Lepinski testified that Cigolo was not "boxed in," hand-cuffed, or detained in any way, and was able to move about if she wanted. Tr. 22:25-23:6.

Sergeant Lepinski uses an audio recorder when interviewing witnesses because the interviews can sometimes be lengthy and it can be difficult to capture all of the information by just taking notes. Tr. 23:14-20. Further, the audio recording serves as a reference. Tr. 23:20-21. Sergeant Lepinski does not "openly" record these interviews as, based on his experience, people tend to leave details out when they know that they are being recorded. Tr. 23:22-24:4. On this occasion, Sergeant Lepinski had the audio recorder in his "leather binder." Tr. 23:15, 42:22-24. Sergeant Lepinski began to record even before he and the other officers approached Cigolo's door. Tr. 23:10-12, 42:25-43:2; *see generally* Gov't Ex. 1.

Initially, Cigolo's brother was present, but the officers asked if they could speak with each of them separately because they were both witnesses. Tr. 24:13-25:6; *see* Gov't Ex. 1 at 5:10-30, 9:43-46. Cigolo was fine with that. Tr. 25:13-15; *see, e.g.*, Gov't Ex. 1 at 5:16-18. Cigolo was not given a *Miranda* warning at any point. Tr. 39:18-20; *see* Tr. 46:8-16.

Law enforcement thanked Cigolo for her willingness to talk with them and reminded her that she did not have to speak with them. Gov't Ex. 1 at 8:56-9:02. Cigolo responded that she had to talk with them because she loved her brother. Gov't Ex. 1 at 9:02-05. Sergeant Lepinski testified that he understood Cigolo's comment to mean that she wanted to "do right by her family, for her brother." Tr. 26:4-14. Law enforcement emphasized that speaking with them was voluntary, and Cigolo responded that she understood and mentioned she was in fact currently going to school for criminal justice. Gov't Ex. 1 at 9:07-24.

The interview with Cigolo lasted approximately 90 minutes. Tr. 26:18-22, 41:13-15; *see generally* Gov't Ex. 1 at 9:43-1:43:30. The interview centered around Cigolo's ex-boyfriend, events leading up to and after the shooting, and Cigolo's own circumstances since the shooting. The interview flowed freely overall. The tone was friendly and Cigolo willingly answered the officers' questions. Cigolo did not at any point indicate that she no longer wished to speak with the officers or answer their questions. During the interview, Cigolo showed the officers text messages on her phone from her ex-boyfriend, readily allowing the officers to look through them when asked. *See, e.g.*, Gov't Ex. 1 at 18:29-38, 18:49-53.

The interview eventually turned to where Cigolo's ex-boyfriend got the gun he used to shoot her brother and three guns Cigolo had previously purchased. Gov't Ex. 1 at 31:20-40:18. During the interview, the officers emphasized that it was important that Cigolo be honest with them and that it was fine if she did not want to answer their questions. Gov't Ex. 1 at 40:23-34. The officers subsequently told Cigolo that one of the guns she had

6

purchased was the gun used in all of these shootings, and they did not believe she was being truthful with them. Gov't Ex. 1 at 57:08-58:11; 1:00:00-39.

The officers stated that Cigolo had already admitted to a crime based on what she had told them during the interview and they were trying to get to the "truth" about what happened. Gov't Ex. 1 at 58:41-59:23. The officers reinforced that Cigolo was not under arrest; she did not have to speak with them; and, "unless there [wa]s a body buried in the basement," they were "walking out of here." Gov't Ex. 1 at 1:01:30-58; *see also* Gov't Ex. 1 at 1:08:36-38 ("I'm not the guy who's trying to slap cuffs on you and take you outta here tonight."). Cigolo proceeded to make statements incriminating herself and implicating Winston with respect to the purchase of the gun. *See, e.g.*, Gov't Ex. 1 at 1:01:59-1:38:49; *see also* Tr. 28:23-29:14, 43:10-16. Cigolo also gave the officers information about locating Winston. *See, e.g.*, Gov't Ex. 1 at 1:17:20- 1:36:06; *see also* Tr. 29:25-30:7.

At the end of the interview, the officers explained to Cigolo that she had lied on the form to purchase the gun; there would be consequences; and they were not sure what was going to happen as a result. Gov't Ex. 1 at 1:38:51-1:39:18. They also told Cigolo that they knew she did not purchase the gun for herself and wanted to give her an opportunity to explain what had happened. Gov't Ex. 1 at 1:41:31-42:06. Additionally, Cigolo gave consent for the officers to search her cell phone. Gov't Ex. 1 at 1:40:20-41:10; *see also* Tr. 30:12-23. Cigolo was not arrested at the end of the interview. Tr. 31:16-18.

Sergeant Lepinski testified that neither he nor any of the other officers threatened Cigolo, made her any promises, or "brandish[ed]" their weapons or handcuffs during the interview. Tr. 31:19-32:3.

7

### D. Interview with Winston

Sergeant Lepinski and the other officers then proceeded to Winston's residence, arriving around 9:00 p.m. Tr. 49:12-14, 50:23-25, 69:12-14. Unlike Cigolo, Winston did not know they were coming to speak with him. Tr. 49:15-17, 50:7-9. Sergeant Lepinski changed into a vest labeled "police" on the front and back and testified that one or two of the other officers put on a similar type of vest. Tr. 51:4-19, 70:20-24, 71:12-24, 77:17-19; *see also* Tr. 78:20-24, 87:18-88:22, 140:13-15. Sergeant Lepinski testified that his service weapon was visible and he believed the same was true for the other officers. Tr. 77:20-78:5; *see also* Tr. 88:4-6, 140:9-141:1.

The officers were let into the building by another resident who was leaving as they approached and were able to identify Winston's apartment based on his driver's license information and the mailboxes in the entryway. Tr. 50:13-21, 73:11-23; Gov't Ex. 4 at 7, 8. Winston's fiancée's name was also listed on the mailbox. Tr. 73:24-25; Gov't Ex. 4 at 7, 8. All of the officers proceeded to Winston's door, and Winston answered. Tr. 51:22-25, 70:5-8, 17-19; *see* Gov't Ex. 2A at 0:00-07.

### 1. Winston

The interview with Winston was also recorded. *See generally* Gov't Ex. 2A, 2B.[5] The officers identified themselves as law enforcement and inquired as to whether they could speak with him and if they could come inside to talk. Gov't Ex. 2A at 00:05-17. In

---

[5] Sergeant Lepinski testified that, despite using the same process he used with Cigolo, there was a "break" in the recording, and the recording ultimately "went into two files." Tr. 72:20-25; *see* Tr. 73:4-7. Sergeant Lepinski acknowledged that "[t]here [wa]s at least a part of the encounter that was not recorded," and testified that he was unsure why that was. Tr. 73:1-4. Sergeant Lepinski testified that "[w]hen [he] went to go upload the audio, it was in two files," and it was nothing he did "intentionally." Tr. 73:5-7. These files are Government Exhibits 2A and 2B.

response, Winston asked if they could "give [him] a second please." Gov't Ex. 2A at 00:15-18. One of the officers rather jokingly responded, "We would prefer you not coming out shooting at us." Gov't Ex. 2A at 00:18-21; *see* Tr. 53:6-21, 75:2-76:4. Another added, "That's the problem we have with people when they do that." Gov't Ex. 2A at 00:22-25.

Sergeant Lepinski acknowledged that when someone is arrested and states that they no longer wish to speak with law enforcement, the conversation ends, but testified that no one told Winston that he could not have a minute or instructed Winston not to go back into the apartment. Tr. 75:2-76:4, 89:13-17. Winston told the officers to "come in, come in, come in, come in," and allowed them to enter. Gov't Ex. 2A at 00:36-38; Tr. 76:5-9. Winston also told them that his fiancée was there with him, and they lived in the apartment together. Gov't Ex. 2A at 00:10-11, 42-47; *see also* Tr. 55:3-12, 148:4-12.

Sergeant Lepinski testified that Winston's apartment was a "relatively small" one-bedroom apartment, including a living room, "small kitchen," "small bathroom[,] and a small bedroom." Tr. 54:17-23; *see also* Tr. 76:20-25. The officers stood "right inside the door in the living room area." Tr. 55:1-2. Sergeant Lepinski testified that "[t]here wasn't a lot of space to move around." Tr. 55:2; *see also* Tr. 76:20-23. Winston joined his fiancée on the couch in the living room. Tr. 55:13-17, 76:10-18, 77:8-10. Neither Winston nor his fiancée were restrained in any way or had their movement restricted. Tr. 55:18-23. The officers remained standing. Tr. 77:11-16.

Once inside, the officers told Winston that he was not under arrest and was "not in trouble that we know of right now." Gov't Ex. 2A at 00:58-1:02, 1:31-32. They explained they just wanted to talk with him and he did not have to speak with them. Gov't Ex. 2A at

1:03-04, 1:31-37.  They also told him that they were not concerned with the marijuana paraphernalia they observed in the apartment.  Gov't Ex. 2A at 1:05-07; *see* Gov't Ex. 2A at 21:37 (Winston and his fiancée smoke marijuana daily); *see also* Gov't Ex. 2A at 16:10-11; Tr. 61:6-8, 86:24-87:8.  The officers told Winston they wanted to speak with him in connection with the shootings they were investigating, including the shooting of Cigolo's brother by her ex-boyfriend.  Gov't Ex. 2A at 1:15-9:27.  Winston told the officers that Cigolo's ex-boyfriend was his cousin.  *See, e.g.*, Gov't Ex. 2A at 1:46-53.  Winston also told the officers to ask their questions and he had nothing to hide.  Gov't Ex. 2A at 7:40-45; *see also* Gov't Ex. 2A at 4:43-45.

While they were in the apartment, the officers observed a paper target with bullet holes hanging on the wall and asked Winston whether he had a gun.  Gov't Ex. 2A at 3:40-3:46; Gov't Ex. 4 at 6; Tr. 61:4-6.  Winston said he did not and the target was from going to the range with a family member some months earlier.  Gov't Ex. 2A at 3:46-4:00, 4:15-18, 5:58-6:13, 6:54-7:00.  The officers also asked about a shotgun cleaning kit they observed.  Gov't Ex. 2A at 4:19-22; *see* Tr. 61:6-7.  Winston and his fiancée explained that it was from his grandfather's cabin that had been recently sold.  Gov't Ex. 2A at 4:22-27. The officers informed them that they were just concerned about safety.  Gov't Ex. 2A at 4:28-30.

The officers explained to Winston that Cigolo had purchased the gun used in the shootings and told them that Winston had asked her to purchase it for him.  Gov't Ex. 2A at 9:36-10:07.  The officers reiterated that they "[we]re walking out of here tonight" unless Winston told them "there [wa]s a dead person in [the] back bedroom . . . ."  Gov't 2A at

10

10:09-20. The officers explained that they were just trying to track the movement of the gun from the time of purchase to Chicago. Gov't Ex. 2A at 10:24-11:08; *see* Tr. 91:8-11. Winston subsequently made incriminating statements regarding the gun. *See, e.g.*, Gov't Ex. 2A at 11:12-16:44; *see also* Tr. 60:1-14, 106:4-13. Included among these statements was that Winston was ineligible to have a firearm. Gov't Ex. 2A at 15:20-16:04; *see* Tr. 60:6-7. At no point during the interview was Winston read his *Miranda* rights. Tr. 81:4-16.

### 2. Search of the Apartment

### a. Winston Withdraws Consent

The officers asked whether Winston still had anything related to the gun Cigolo had purchased, and Winston said he did not. Gov't Ex. 2A at 13:30-39. Later, they asked whether Winston had "anything in [his] house that [he] shouldn't," and Winston volunteered that the officers could search the apartment. Gov't Ex. 2A at 21:31-22:11; *see also* Tr. 62:4-8, 106:14-23. Sergeant Lepinski testified that based on the "indicia" of firearms in the apartment and some of Winston's statements, they "wanted to search the apartment to ensure that there . . . [were] no firearms or other contraband inside." Tr. 61:9-14; *see* Gov't Ex. 2A at 23:13-27. Sergeant Lepinski also testified that they were looking for items that belonged to the gun Cigolo had purchased, "things like a gun box, an owner's manual." Tr. 61:17-20; *see* Tr. 81:17-23.

The officers presented Winston with a consent form and asked if they could search the apartment (including the bedroom), telling Winston it was "up to [him]" as he was "the one who live[d] here." Gov't Ex. 2A at 23:14-42; *see also* Tr. 62:9-14, 62:23-63:7, 106:24-

107:1. Winston respectfully declined to have the officers conduct a search without a warrant. Gov't Ex. 2A at 23:44-24:17; Tr. 85:17-23; 86:5-7, 107:1-3. Some of the officers then proceeded to discuss obtaining a search warrant. Tr. 63:12-16.

### b. Winston's Fiancée & the Bedroom

Other officers then asked Winston's fiancée if they could speak with her, and she agreed. Gov't Ex. 2A at 25:12-16; *see* Tr. 107:15-25, 158:7-17. Special Agents Labno and Myers followed Winston's fiancée "into the only other space that was available for somewhat privacy, which was the bedroom." Tr. 64:1-2; *see* Tr. 83:10-24, 85:24-86:4, 92:4-6; 107:25-108:4, 108:14-16, 129:25-130:6. Sergeant Lepinski agreed "that for most people the bedroom is an actually more private space than the living room of their home." Tr. 83:25-84:3. Special Agent Myers started an audio recorder as they walked towards the bedroom. Tr. 131:11-14; *see generally* Gov't Ex. 3.

Special Agent Labno has been with the ATF for over 18 years. Tr. 103:17-19. His primary duties involve the investigation of violations of federal firearms and narcotics laws. Tr. 103:20-23. Special Agent Labno had on his "soft vest" and was otherwise dressed in plainclothes. Tr. 104:16-23. Special Agent Labno was armed, but his service weapon was under his shirt and not visible. Tr. 104:24-105:6. Special Agent Myers has been with the ATF for a little over a year and a half. Tr. 127:18-20. Special Agent Myers was wearing plainclothes with his "body armor and a belt" that had places for his service weapon, flashlight, and other tools. Tr. 128:20-129:1; *see* Tr. 140:13-21.

Special Agent Labno testified that, after Winston withdrew his consent to search, the officers wanted to know why he did not want them to search the apartment. Tr. 107:12-

12

14, 125:1-5; *see also* Tr. 130:11-18, 139:3-5, 144:24-145:1.  Special Agent Labno further testified that, based on his "experience dealing with people who traffic[] in illegal firearms," the target on the wall, and the shotgun cleaning kit, he "suspected that there possibly was some other type of firearm-related paraphernalia or firearms in the residence." Tr. 107:6-11.

Once in the bedroom, Special Agent Labno asked Winston's fiancée why Winston did not want them to search.  Gov't Ex. 3 at 00:00-1:33.  Winston's fiancée responded that she did not know.  Gov't Ex. 3 at 1:30-42.  Special Agent Labno testified that Winston's fiancée "was acting pretty erratically," and he thought "she was possibly using some type of narcotics, specifically marijuana."  Tr. 108:23-109:1; *see* Tr. 121:17-25; *cf.* 139:22-140:2.  Special Agent Labno testified that he wanted to make sure that the situation was safe and "there wouldn't be a weapon lying about or something like that."  Tr. 109:1-5.  To this end, Special Agent Labno was looking around the bedroom while speaking with her. Tr. 109:6-8.

The bedroom was fairly small.  *See generally* Winston Ex. 1.  Special Agent Myers was standing just inside the door.  Tr. 130:25-131:3.  Special Agent Labno was standing in the far corner where the closet and the wall with the window come together.  Tr. 113:25-114:5; *see* Winston Ex. 1; *see also* Tr. 112:19-24, 122:6-18, 131:7-10, 134:17-23.  The closet consisted of two sliding doors.  Winston Ex. 2.  One of the doors was close to fully open, revealing the contents of that portion of the closet.  Tr. 123:14-124:4; *see* Winston Ex. 4.  Special Agent Labno noticed a large duffle bag and asked Winston's fiancée about it.  Gov't Ex. 3 at 2:15-19; *see* Winston Exs. 3, 4; Gov't Ex. 4 at 1.  Special Agent Labno

also noticed a small safe[6] on the floor in the portion of the closet nearest to where he was standing. Tr. 109:16-110:14; *see* Tr. 112:2-8, 114:14-24, 143:4-5; Winston Ex. 4; Gov't Ex. 4 at 1. Special Agent Labno testified that he did not have to move or open the closet door to see the safe, nor did anyone else. Tr. 110:11-21, 118:7-13; *see also* Tr. 133:25-134:2, 137:7-21. Special Agent Myers likewise testified that he did not observe Special Agent Labno open or manipulate the door. Tr. 137:7-21.

Special Agent Labno testified that if a person was standing in front of the safe, looking at it straight on, it would have been partially obscured by one of the closet doors. Tr. 112:15-18; *see* Tr. 114:14-24, 124:16-19, 133:15-24; Winston Ex. 4. As stated above, Special Agent Labno was not directly in front of the safe, but off to the side, allowing him to see into the closet at a bit of an angle. Tr. 112:19-113:7; *see* Tr. 118:20-23; *see also* Tr. 124:5-15. Special Agent Myers testified that, while he was not able to see the safe from his initial position near the bedroom door, he was able to see it when he traded places with Special Agent Labno. Tr. 133:6-14, 134:3-5.

Based on his experience, Special Agent Labno testified that these "types of safes when they are encountered in the context of our activities usually hold things such as guns, money, or drugs." Tr. 110:23-111:2. Special Agent Labno asked Special Agent Myers if he could borrow his flashlight. Gov't Ex. 3 at 2:56-59; *see* Tr. 123:4-10. Special Agent Labno used the flashlight like "a pointer" and kicked the safe to "emphasize" which item he was asking about. Tr. 114:15-115:21; *see* Tr. 123:8-13; Gov't Ex. 3 at 3:22-25. Special

---

[6] The secure container found on the floor of the closet has been referred to as both a "lockbox" and a "safe."

14

Agent commented that the safe "seem[ed] heavy" and asked Winston's fiancée what was in it.  Gov't Ex. 3 at 3:27-40; *see* Tr. 114:25-115:21.

Winston's fiancée told Special Agent Labno that the safe was for inheritance money,[7] but there was nothing in it.  Gov't Ex. 3 at 3:30-51; *see* Gov't Ex. 3 at 6:57-7:08.  Winston's fiancée told Special Agent Labno that she did not "even know how to open" it.  Gov't Ex. 3 at 3:52-54.  Special Agent Labno subsequently left the bedroom and asked another officer to remain with Winston's fiancée and Special Agent Myers.  Tr. 116:22-24.

Winston's fiancée recalled what happened differently.  Winston's fiancée testified that Special Agent Labno "asked [her] to come in the bedroom."  Tr. 158:18-24; *see also* Tr. 159:16-20.  She testified that she did not object "because [she] didn't know that [she] could object to anything."  Tr. 159:21-24.  She testified that Special Agent Labno was "flashing [the flashlight] all over" the bedroom and used it to lift up the corner of the comforter on the bed.  Tr. 152:16-18; *see* Tr. 153:6-21; *see also* Tr. 162:5-12.  Winston's fiancée testified that the closet door "was not even half open."  Tr. 154:1.  She testified that Special Agent Labno asked her what was on the floor of the closet and subsequently "slid open [the] door . . . with his index finger."  Tr. 154:5-16; *see also* Tr. 164:14-16, 165:13-24.  Winston's fiancée testified that it bothered her when Special Agent Labno did this because she had personal items in the closet.  Tr. 164:17-19.  She was also uncomfortable

---

[7] Winston's mother had passed away.  Gov't Ex. 3 at 3:32-34.

with him looking around but did not say anything "because [she] didn't know [she] could." Tr. 164:20-165:5; *see* Tr. 167:13-23.

Winston's fiancée testified that safe was approximately in the same location depicted in Winston Exhibit 4 when the officers came to the apartment, but that she does not "usually keep [the] closet door open this far." Tr. 154:19-155:14; *see* Winston Ex. 4. She explained that the apartment is on the ground floor, there is a window by the closet, and she does not want people looking in, so "[m]ost times" the door is shut all the way. Tr. 155:15-24. Winston's fiancée testified that, on the night the officers came, the closet door was approximately a fourth of the way open, up "[t]o where the gray sweatshirt is or the ugly Santa shirt." Tr. 155:25-156:10; *see* Winston Ex. 4; Tr. 166:21-23. She testified that, before Special Agent Labno moved the door, the safe could not be seen. Tr. 156:13-21. Winston's fiancée testified that she did not give Special Agent Labno consent to search the apartment, including the closet. Tr. 157:1-8. On cross-examination, Winston's fiancée acknowledged that she regularly smoked marijuana and had smoked marijuana that evening though "[n]ot a lot." Tr. 159:4-13.

### c.  The Safe

Special Agent Labno asked Winston about the safe in the bedroom. Tr. 64:3-24, 116:24-117:1. Winston went looking for the key. Tr. 65:3-13; *see* Gov't Ex. 2B at 00:00-30; Gov't Ex. 3 at 8:06-48; Tr. 117:3-9. As Special Agent Myers pulled out the safe for Winston, it was discovered that the safe was already unlocked and Winston proceeded to open it. Tr. 65:13-24, 136:7-137:6; *see* Gov't Ex. 2 at 8:49-9:03; Tr. 117:11-18. Winston was not commanded or told that he needed to open the safe. Tr. 65:25-66:4. Inside the

safe was a plastic gun case. Tr. 66:4-8, 117:19-21; Gov't Ex. 4 at 1, 2; *see* Gov't Ex. 2B at 00:50-56; Gov't Ex. 3 at 9:05-9:08. Winston appeared surprised and told the officers they could take the safe and the case. Tr. 66:9-14, 118:3-5; Gov't Ex. 3 at 9:06-14; *see* Gov't Ex. 2B at 00:50-1:10. The officers asked Winston whether there was anything in the case, and he responded that there should not be, but there could be a clip in there that came with the gun; he just could not remember. Gov't Ex. 2B at 00:59-1:22; Gov't Ex. 3 at 9:15-41. Winston told the officers to take whatever they needed to take and to "take the whole thing." Gov't Ex. 3 at 9:23-26. Winston subsequently opened the case and inside was a black ski mask, trigger lock, and a loaded magazine matching the brand of the gun Cigolo had purchased. Tr. 66:18-67:5; Gov't Ex. 4 at 3, 4, 5, 9, 10; *see* Gov't Ex. 3 at 11:08-12:06.

The officers subsequently asked Winston "one more time" for consent to search the rest of the apartment, and he declined. Gov't Ex. 2B at 5:40-54; Gov't Ex. 3 at 13:57-14:09.

### d. Tone of the Interview

Like the interview with Cigolo, the tone of the interview with Winston was also friendly and flowed freely overall.[8] Winston willingly answered the officers' questions and did not at any point indicate that he no longer wished to speak with them or answer their questions. *See, e.g.*, Tr. 57:11-25, 58:7-17, 91:17-18. While there was marijuana paraphernalia in the apartment, Sergeant Lepinski testified that Winston did not "appear to

---

[8] The tone became somewhat brusquer at the very end, during the last approximately three minutes the officers were in the apartment. *See, e.g.*, Gov't Ex. 2B at 6:06-9:06; *see also* Gov't Ex. 3 at 14:22-17:19.

be under the influence."  Tr. 58:1-3; *see also* Tr. 86:20-23.  There were no threats or promises made by the officers to speak with either Winston or his fiancée or to open the safe and gun case.  Tr. 68:18-25, 92:17-24.  The officers did not brandish their service weapons or handcuffs.  Tr. 69:1-5.  Winston was not arrested that evening.  Tr. 68:15-17.

At various points, Winston's fiancée mentioned that her sister had previously worked in law enforcement.  Gov't Ex. 2A at 24:44-46; *see also* Gov't Ex. 2A at 15:48-49.  Winston's fiancée remarked on at least two occasions how "nice" the officers were, calling them "refreshing" at one point.  Gov't Ex. 2A at 22:12-15, 24:22-47.  Just before the officers left, Winston's fiancée remarked, "You guys are like a pleasantry[9] like I've never had in my life, wow."  Gov't Ex. 3 at 17:36-38.  And, as the officers were leaving, Winston's fiancée thanked them "for being nice."  Gov't Ex. 3 at 18:33-35.  On cross-examination, however, Winston's fiancée testified that these comments were directed at all of the officers except for Special Agent Labno.  Tr. 167:24-168:19.

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned Magistrate Judge makes the following conclusions of law.

### A.  Suppression of Statements

Cigolo and Winston both argue that the statements they made to law enforcement were the products of unlawful custodial interrogations and, because neither of them were advised of their *Miranda* rights, their statements must be suppressed.

---

[9] It is difficult to discern whether Winston's fiancée said "pleasantry" or "pleasant treat."

"The Fifth Amendment requires that *Miranda* warnings be given when a person is interrogated by law enforcement after being taken into custody." *United States v. Giboney*, 863 F.3d 1022, 1027 (8th Cir. 2017); *see, e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 444-45, (1966). "Officers must provide *Miranda* warnings to suspects in custody because 'the inherently coercive nature of custodial interrogation blurs the line between voluntary and involuntary statements.'" *United States v. Diaz*, 736 F.3d 1143, 1148 (8th Cir. 2013) (internal quotation marks omitted) (quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011))." "Failure to do so results in a violation of the suspect's Fifth Amendment rights and renders any statement gained from the violation inadmissible in the government's case-in-chief." *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012).

"The ultimate question in determining whether a person is in 'custody' for purposes of *Miranda* is 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)); *accord Giboney*, 863 F.3d at 1027. Whether Cigolo and Winston were in custody "is not a matter of [their] own subjective belief, but turns on whether a reasonable person in [their] shoes would have felt free to end the interview." *United States v. Ollie*, 442 F.3d 1135, 1137 (8th Cir. 2006) (citing *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). When determining "whether a suspect was in custody, [courts] ask whether, given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave or cause the agents to leave." *United States v. Laurita*, 821 F.3d 1020, 1024 (8th Cir. 2016) (quotation omitted).

19

Six non-exhaustive factors "inform [the Court's] analysis." *Giboney*, 863 F.3d at 1027. They are:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). The first three are "mitigating" and, when present, tend to show that a suspect is *not* in custody. *Giboney*, 863 F.3d at 1027; *Griffin*, 922 F.2d at 1349. Conversely, the last three are "coercive" and thus, when present, tend to show that a suspect is *in* custody. *Giboney*, 863 F.3d at 1027; *Griffin*, 922 F.2d at 1349.

The Eighth Circuit Court of Appeals has cautioned "that 'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *Czichray*, 378 F.3d at 827; *see, e.g.*, *United States v. Perrin*, 659 F.3d 718, 720 (8th Cir. 2011) ("*Griffin* is simply a rubric for considering the ultimate issue, not a mandatory checklist."); *Ollie*, 442 F.3d at 1140 ("It is important to note that a decision on the matter of custody requires more than tallying a ledger."). "The ultimate inquiry must always be whether the defendant was restrained as though he [or she] were under formal arrest." *Czichray*, 378 F.3d at 828.

### 1. Cigolo

There is no dispute that Cigolo was not arrested at the end of the interview. "Lack of arrest is a very important factor weighing against custody." *United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) (quotation omitted). Acknowledging that she was not placed under arrest that evening, Cigolo argues that the remainder of the factors show that this was in fact a custodial setting. Considering the totality of the circumstances and what a reasonable person would have felt under those circumstances, the Court concludes that Cigolo was not restrained in a manner commensurate with formal arrest.

Beginning with the first factor, Cigolo argues that she "was not informed that she was free to leave or request the officers to do so" and, while she may have been told that speaking with the officers was voluntary, she "made clear she felt compelled to cooperate with the officers." Cigolo's Mem. in Supp. at 6, ECF No. 58. Cigolo further argues her "defensive attitude once Sergeant Lepinski's questioning began to implicate [her]" demonstrates that she did not feel as though she could ask the officers to leave. Cigolo's Mem. in Supp. at 6.

The first factor weighs in heavily in favor of a non-custodial setting. As Cigolo herself admits, she was told at the outset that she did not have to speak with the officers. The officers took care to reinforce the voluntary nature of the interview after Cigolo made comments to the effect that she felt compelled to cooperate out of a sense of familial obligation. Later, when the officers challenged whether Cigolo was being truthful with them, the officers again emphasized that she was not under arrest; she did not have to speak with them; and, absent "a body buried in the basement," they were not intending to arrest

21

her.  It was after these repeated reminders that she did not have to speak with them that Cigolo made incriminating statements to the officers.  "Advice that a suspect is not under arrest, and that h[er] participation in questioning is voluntary, is highly probative of whether a reasonable person would feel that [s]he may terminate the interview." *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014); *see also Czichray*, 378 F.3d at 826 ("That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview.").

As for the second factor, Cigolo maintains that she "did not have unrestrained freedom" because, although "[s]he may have been able to stand up and move about the room, . . . there is no indication [she] felt free to move around her house."  Cigolo's Mem. in Supp. at 6.  Cigolo also points to the fact that she had been separated from her brother and argues that, if she had attempted to go to where her brother was, the officers would have stopped her.  "A suspect will generally feel more able to end an interview when h[er] mobility is unimpeded by the authorities." *Ollie*, 442 F.3d at 1138.  Sergeant Lepinski credibly testified that Cigolo was not restrained in any way and was able to move about if she wanted.  At no point did Cigolo attempt or request to move about and was prohibited from doing so. *See Laurita*, 821 F.3d at 1025 ("Laurita never asked to move around in the room or leave during the course of the interview.").

Further, the officers spoke with Cigolo in the familiar context of her own living room.  "When a person is questioned on h[er] own turf, [the Eighth Circuit] has observed repeatedly that the surroundings are not indicative of the type of inherently coercive setting

that normally accompanies a custodial interrogation." *Czichray*, 378 F.3d at 826 (quotation and citation omitted); *see also Williams*, 760 F.3d at 815 ("*Miranda* itself . . . juxtaposed the police station . . . with a suspect's own home" (quotation omitted)).  Nor did the officers command Cigolo and her brother separate.  *See Griffin*, 922 F.2d at 1352 ("A frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements . . . .").  The officers requested to speak with them individually, explaining the reasoning behind their request—both Cigolo and her brother were witnesses.  Cigolo readily agreed to speak with the officers by herself, stating she understood the officers' reasoning.  Accordingly, the second factor likewise favors a non-custodial setting.

With respect to the third factor, Cigolo emphasizes that "Sergeant Lepinski initiated the contact."  Cigolo's Mem. in Supp. at 7.  The third factor is not limited, however, to who initiated the conduct.  The third factor also looks at whether "the suspect . . . voluntarily acquiesced to official requests to respond to questions."  *Griffin*, 922 F.2d at 1349.  As stated above, Cigolo was advised several times that she did not have to speak the officers, something the officers stressed when her responses arguably suggested a feeling of compulsion.  *Cf. Giboney*, 863 F.3d at 1028.  While Sergeant Lepinski may have initiated contact, Cigolo chose to speak with the officers after she was repeatedly advised that she was not required to do so.  *See Czichray*, 378 F.3d at 829 ("Against a backdrop of repeated advice that he was free to terminate the interview, Czichray's decision not to terminate the interview and to allow the interview to proceed to its closing suggests an exercise of free

will, rather than restraint to a degree associated with formal arrest."). Moreover, Cigolo was friendly and cooperative, readily showing officers information on her cell phone and willingly answering their questions. *See United States v. Axsom*, 289 F.3d 469, 501-02 (8th Cir. 2002). Therefore, this factor too favors a non-custodial setting.

Turning to the fourth factor, Cigolo argues that the officers employed deceptive tactics because they "surreptitiously recorded" the interview and were not up front about why they wanted to speak with her. Cigolo argues that had she known Sergeant Lepinski intended to implicate her, "it is doubtful she would have been so accommodating." Cigolo's Mem. in Supp. at 7. Sergeant Lepinski credibly testified that his practice of using an audio recorder during interviews was driven by a desire to accurately capture all of the information being conveyed, not anything about Cigolo specifically. Sergeant Lepinski also credibly testified that, based on his experience, people overall are less forthcoming with information when they know they are being recorded. Cigolo has offered no authority for the proposition that use of an audio recorder in this manner amounted to a deceptive strategy. Nor has she articulated how Sergeant Lepinski's "surreptitious[]" use of the audio recorder would have impacted a reasonable person's perception of her freedom to end the interview. *See Laurita*, 821 F.3d at 1026 ("The use of deception is irrelevant unless it relates to a reasonable person's perception of his freedom to depart.").

Most importantly, Sergeant Lepinski did not deceive Cigolo regarding the purpose of the interview. Sergeant Lepinski credibly testified that, when setting up the meeting, he told Cigolo that he wanted to discuss new information he had since obtained that she was the one who purchased the gun used in the shooting of her brother. Thus, Sergeant Lepinski

made clear even before the officers arrived that law enforcement was interested in the details of a gun purchase Cigolo had made. Accordingly, the fourth factor likewise weighs in favor of a non-custodial setting.

Lastly, with respect to the fifth factor, Cigolo argues that this was a police-dominated atmosphere based on five officers being present to interview her. Cigolo points to her previous interaction with Sergeant Lepinski on an individual basis and argues the four other officers accompanying him were "unnecessary." Cigolo's Mem. in Supp. at 7. Cigolo also points to Sergeant Lepinski's testimony that not all of the officers were present at her door initially so as not to overwhelm her. Cigolo argues that "even *three* officers, with badges, guns, and handcuffs showing, would overwhelm a single female." Cigolo's Mem. in Supp. at 7. Here, Sergeant Lepinski was cognizant of the effect five officers showing up at once could have on Cigolo. Only three officers went in initially and they then respectfully asked Cigolo for permission for the other two to join, which she allowed. Additionally, the interview took place in her living room. *See Czichray*, 378 F.3d at 826-27; *see also Axsom*, 289 F.3d at 502 ("When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial"). This factor too weighs in favor of a non-custodial setting.

In sum, when the circumstances of this case are analyzed through the rubric of the *Griffin* factors, each of those factors favors a finding that Cigolo was not in custody when she spoke with law enforcement. Where, as here, a suspect is questioned in the familiar surroundings of her home and repeatedly advised that she need not speak with law enforcement, "strong evidence of restraint on freedom of movement of the degree

associated with a formal arrest is necessary to overcome the natural inference that such questioning is non-custodial." *Czichray*, 378 F.3d at 830. There is no evidence of restraint on Cigolo's freedom of movement, let alone *strong* evidence. Based on the totality of the circumstances, the Court concludes that a reasonable person in Cigolo's position would have felt free to terminate the encounter, Cigolo was not in custody, and the officers were thus not required to inform her of her *Miranda* rights.[10] *See Williams*, 760 F.3d at 815 ("But a reasonable resident who is unrestrained near the front door in the living room of his home, and who is advised that there is no arrest and that participation in any interview is voluntary, should know that he is free to leave or to terminate questioning."). The Court therefore recommends that Cigolo's motion to suppress be denied.

### 2. Winston

Winston focuses on the second, third, and fifth factors, arguing that while the "[o]fficers might have *told* [him that] he could stop the encounter, . . . their interactions with [him] *showed* him that he was not in control, they were." Winston's Mem. in Supp. at 12, ECF No. 59. Considering the totality of the circumstances and what a reasonable person would have felt under those circumstances, the Court likewise concludes that Winston was not restrained in a manner commensurate with formal arrest.

As an initial matter, the first, fourth, and sixth factors weigh in favor of a non-custodial setting. Like Cigolo, Winston was not arrested at the end of the interview. *See Galceran*, 301 F.3d at 931. Winston was informed at the outset that he was not under arrest

---

[10] Because the Court concludes that Cigolo was not in custody, the Court need not address whether the interview constitutes an interrogation (a point the Government does not dispute) or whether she voluntarily waived her *Miranda* rights.

and he did not have to speak with the officers. *See Williams*, 760 F.3d at 814-15. Additionally, the officers later emphasized to Winston that they were "walking out of" the apartment that night unless "there [wa]s a dead person" in the bedroom. Nor does Winston claim that the officers engaged in strong-arm tactics or deception. While the officers may have been armed, they "did not adopt a threatening posture toward [Winston], display their weapons, or make a physical show of force during the questioning." *Axsom*, 289 F.3d at 502. And, Winston's fiancée was present during the interview to offer support. *See United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011); *Griffin*, 922 F.2d at 1352.

Turning to the second factor, Winston raises a similar argument that his movement was restrained because he was "boxed in on the couch while surrounded by five officers." Winston's Mem. in Supp. at 11. While the surroundings might have felt a bit more cramped due to the size of the apartment, Winston was still in the comfort of his own home, accompanied by his fiancée. *See Czichray*, 378 F.3d at 826, 830. Sergeant Lepinski credibly testified that neither Winston nor his fiancée were restrained in any way, and there is no evidence that either of them were prevented from moving about as they wished. *See Laurita*, 821 F.3d at 1025. Thus, this factor favors a non-custodial setting.

As for the third factor, Winston did not initiate contact with the officers and, unlike Cigolo, he was not apprised ahead of time that they were coming to talk to him. Winston argues that he did not voluntarily acquiesce to the officers' questions as demonstrated by their refusal to honor his request "for a little time to himself first" when they arrived and failure to terminate the interview when he told them "he did not want them to search his house." Winston's Mem. in Supp. at 11. While Winston may not have initiated contact

27

with law enforcement, the Court concludes he voluntarily acquiesced to their request to speak with him.  When the officers came to see him, Winston asked for a moment before speaking with them.  Winston asserts that this request was "unacceptable" to them.  Winston's Mem. in Supp. at 11.  But, as borne out by the audio recording and Sergeant Lepinski's credible testimony, the "officers did not prevent Winston from going inside his apartment or forbid him from taking a moment for himself before speaking with them."  Govt's Mem. in Opp'n at 19, ECF No. 64.  "Rather, [the] officers merely expressed a safety concern with a person they'd just met ducking back inside the apartment after learning there were police officers at his door."  Gov't Mem. in Opp'n at 19.  The officers communicated their concern in a casual, almost facetious manner and, in response, Winston invited them in.

Nor does the mere fact that the officers did not immediately depart after Winston declined to have the apartment searched without a warrant call into question the voluntariness of his willingness to speak with them.  As stated by the Government, "[b]y declining consent to search, Winston showed he understood how to assert his rights when he wanted to, yet he never expressed a desire not to speak with police, to terminate the encounter, or have [the officers] leave the [apartment]."  Gov't Mem. in Opp'n at 20.  Instead, Winston chose to speak with the officers after he was advised that he was not required to do so, welcoming their questions.  *See Czichray*, 378 F.3d at 829.  Further, the overall tone of the interview was friendly with Winston willingly answering the officers' questions.  *See Axsom*, 289 F.3d at 501-02.  Accordingly, the third factor also favors a non-custodial setting.

28

With respect to the fifth factor and the existence of a police-dominated atmosphere, Winston argues the circumstances of his interview are distinguishable from Cigolo's. Whereas the officers presented themselves to Cigolo in smaller numbers and advised ahead of time that they wished to speak with her, Winston did not know the officers were coming and all five officers were standing at his door when he opened it. Winston argues that the officers' appearance was different in kind as well, having donned ballistics-style vests and carrying their service weapons more prominently, and they came "late at night." Winston's Mem. in Supp. at 11.

Winston's argument has some appeal. The appearance of five officers at the door—unannounced, late in evening, most of whom were visibly carrying their service weapons, and at least some of whom wore vests emblazoned with law-enforcement logos—and their collective presence during the interview could well suggest an atmosphere of police domination. *See, e.g.*, *Perrin*, 659 F.3d at 720, 721 (at least six officers arrived in tactical gear to execute a search warrant); *cf., e.g.*, *Williams*, 760 F.3d at 813 (questioning by a single officer); *Axsom*, 289 F.3d at 502 (interview conducted by only two of nine agents present). At the same time, Winston was in the comfort of his own albeit small living room with his fiancée beside him. *See Williams*, 760 F.3d at 815; *Czichray*, 378 F.3d at 826-827; *Axsom*, 289 F.3d at 502.

But even if the atmosphere were police-dominated, this is not dispositive of whether Winston was in a custodial setting. *See Giboney*, 863 F.3d at 1028 ("But we have refused to find custody in circumstances where the atmosphere was much more police dominated."); *see also Williams*, 760 F.3d at 815; *Perrin*, 659, F.3d at 721. At bottom, the

question is whether Winston experienced restraint on his freedom of movement to the degree associated with formal arrest. *Giboney*, 863 F.3d at 1027. Winston did not.

Winston was advised he did not have to speak with law enforcement, questioned in his home with his fiancée present, and unrestrained, free to move about as he wished. *See Williams*, 760 F.3d at 815; *Czichray*, 378 F.3d at 830. Based on the totality of the circumstances, the Court concludes that a reasonable person in Winston's position would have felt free to terminate the encounter; Winston was not in custody; and the officers were thus not required to inform him of his *Miranda* rights. The Court therefore recommends that Winston's motion to suppress be denied with respect to the statements he made to law enforcement.

### B. Suppression of Evidence

Winston also moves for suppression of the evidence the officers obtained from the closet, namely, the contents of the safe. The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV; *United States v. Rowe*, 878 F.3d 623, 628 (8th Cir. 2017). The Supreme Court has stated that "[a]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quotation omitted). Thus, generally speaking, "[w]arrantless searches inside a home are presumptively unreasonable." *United States v. Quarterman*, 877 F.3d 794, 797 (8th Cir. 2017) (quotation omitted); *see also, e.g.*, *United States v. Pile*, 820 F.3d 314, 316 (8th Cir. 2016) ("Generally, a warrantless search of a home is unreasonable.").

But, "[o]bserving objects in plain view violates no reasonable expectation of privacy, which obviates the need for a search warrant." *United States v. Banks*, 514 F.3d 769, 773 (8th Cir. 2008) (citing *Horton v. California*, 496 U.S. 128, 133 (1990)); *see also United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995) ("[I]f an item is in plain view, looking at it invades no privacy interests."). "[P]olice do not conduct a search in the Fourth Amendment sense merely by using their eyes." *United States v. Trower*, 285 F. App'x 321, 323 (8th Cir. 2008) (per curiam); *see also United States v. Morgan*, 842 F.3d 1070, 1075 (8th Cir. 2016). The limited issue before the Court is whether Special Agent Labno observed the safe in plain view or if the safe was visible only after he "manipulate[d] the physical environment within the home with the intent to uncover information." *Trower*, 285 F. App'x at 324 (citing *Arizona v. Hicks*, 480 U.S. 321, 324-25 (1987)). Stated differently, was the closet door open far enough to see the safe at an angle or did Special Agent Labno open it wider before he was able to see the safe?

Resolution of this question is ultimately a matter of credibility. Special Agent Labno testified that he saw the safe without opening the closet door and did not open the door. Winston's finance testified that safe was not visible and only became visible when Special Agent Labno opened the door. The Court credits the testimony of Special Agent Labno based on its overall consistency with other evidence in the record, including but not limited to the testimony of Special Agent Myers and the contemporaneous audio recording, and the incongruity of Winston's finance's testimony with the evidence.

Special Agent Labno testified that he asked Winston's fiancée if they could speak with her and she led him, along with Special Agent Myers, to the bedroom. While

31

Winston's fiancée testified that Special Agent Labno asked her to come to the bedroom, Special Agent Myers's testimony corroborates that Winston's fiancée chose the location and the audio recording that captured Special Agent Labno's request does not specify a location.

As for Special Agent Labno's ability to view the safe, Winston argues that "clearly if the closet door was open as far as Special Agent Labno asserts it was (wide open, as depicted in [Winston] Exhibit 4), *anyone* could see the safe at any vantage point." Winston's Mem. in Supp. at 13. But, the width of the open door does not go to the heart of the matter. It is undisputed that the safe was partially obscured by the door. Special Agent Labno credibly testified and explained *how* and *why* he was able to view the safe from his position in the far corner whereas Special Agent Myers could not from his position near the bedroom door—*the angle of observation*. Special Agent Labno's testimony was later corroborated by Special Agent Myers, who testified that, once he assumed the same position in the far corner where Special Agent Labno was, i.e., had the same angle of observation, he too was able to see the safe. Further, Special Agent Labno's use of a flashlight is not constitutionally significant and, in any event, Special Agent Labno credibly testified that he was using the flashlight as a means to point out the safe. *See, e.g.*, *Trower*, 285 F. App'x at 324 ("We attach no importance to the fact that Rorebeck used a flashlight."); *Hatten*, 68 F.3d at 261 ("It does not matter that Officer Pfeffer used a flashlight.").

Whereas Special Agent Labno's testimony was highly consistent with other evidence in the record, the testimony of Winston's fiancée was conspicuously inconsistent

with the evidence.  First, Winston's fiancée admitted that she regularly smokes marijuana and was smoking marijuana on the night in question, which "calls into question her ability to perceive and remember the specific events of that evening."  Gov't Mem. in Opp'n at 25.  Second, there are multiple places where the testimony of Winston's fiancée diverges from the consistent testimony of Special Agents Labno and Myers as well as the contemporaneous audio recording, including but not limited to how the bedroom was chosen, where Special Agent Labno got the flashlight, and whether Special Agent Labno opened the closet door.

Third, while Winston's fiancée gave credible testimony as to the reasons why she generally keeps the closet door closes, her testimony regarding the position of the door on the night in question was not credible.  Special Agent Labno can be clearly heard asking Winston's fiancée about a large duffle bag in the closet, a duffle bag which would have been difficult to see if the door was only partially open as Winston's fiancée testified.

Lastly, the testimony of Winston's fiancée regarding how she felt when the officers were in her home stands in stark contrast to the contemporaneous audio recording where Winston's fiancée can be heard freely conversing with the officers in a friendly manner.  Winston's fiancée also told the officers that her sister had worked in law enforcement.  And, rather than manifesting resentment, displeasure, or concern with the officers' conduct, Winston's fiancée repeatedly praised their professionalism and congeniality.  The contemporaneous recording of her behavior on the night in question cannot be reconciled with her testimony.

In sum, the Court concludes that the safe was in plain view of Special Agent Labno, and therefore recommends that Winston's motion to suppress be denied with respect to the safe.[11]

[Continued on next page.]

---

[11] Because the Court concludes that the safe was in plain view, the Court does not reach the Government's alternative argument that Winston's act of opening up the safe "is an intervening circumstance that interrupts the connection between the allegedly illegal search and the discovery of the incriminating evidence." Gov't's Mem. in Opp'n at 28.

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Cigolo's Motion to Suppress Defendant's Statements, ECF No. 42, be **DENIED**.

2. Winston's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, ECF No. 33, be **DENIED**.

3. Winston's Motion to Suppress Statements, Admissions, and Answers, ECF No. 34, be **DENIED**.

Date: April___27___, 2020                    _____*s/Tony N. Leung*_____
                                             Tony N. Leung
                                             United States Magistrate Judge
                                             District of Minnesota

                                             *United States v. Cigolo et al.*
                                             Case No. 19-cr-272 (NEB/TNL)

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.