## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 19-CR-272 (NEB/TNL) |
| Plaintiff, | |
| v. | ORDER ON REPORT AND RECOMMENDATION |
| SEQUANA CIGOLO (1) and JASON LYNNDROTTI WINSTON (2), | |
| Defendant. | |

This matter is before the Court on the objections of defendants Sequana Cigolo and Jason Lynndrotti Winston to the April 27, 2020 Report and Recommendation ("R&R") of United States Magistrate Judge Tony N. Leung (ECF Nos. 68, 70, 71.) Judge Leung recommends denying the motions. (ECF Nos. 33, 34, 42.) The Court has conducted a *de novo* review. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b); D. Minn. LR 72.2. Based on that review, the Court accepts the R&R.

## ANALYSIS

The undisputed facts are set forth in the R&R and are incorporated by reference. Both defendants argue that their statements should be suppressed. Winston also argues

1

that evidence found at his apartment should be suppressed. The Court addresses each argument in turn.

I.      **Suppression of Statements**

Cigolo and Winston argue the statements they made to the officers were the product of unlawful custodial interrogations, and because they were not advised of their *Miranda* rights prior to making the statements, the statements must be suppressed. As all parties agree, the R&R identified the relevant factors to determine when an interrogation is custodial. Those well-established factors are:

> (1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officer to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). If after considering the factors, a court determines that the interview was custodial and that the defendant was not informed of his or her *Miranda* rights, then the statements were obtained in violation of the Fifth Amendment and must be suppressed. *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012). Here, the R&R found that neither Cigolo nor Winston were subject to unlawful custodial interviews when they made the challenged statements and that the

2

statements need not be suppressed. After reviewing the record, the Court agrees.

### A. *Cigolo Interview*

On September 24, 2019, five police officers interviewed Cigolo for approximately 90 minutes about the shooting of her brother and two other shootings in Chicago. (R&R at 3–4; *see generally* Gov. Ex. 1.) Sergeant Lepinski, one of the five officers, recorded the conversation, but did not tell Cigolo he was doing so. (R&R at 5 (citing Tr.[1] at 23-24).) The interview occurred in Cigolo's home.  The officers were in plain clothes but likely had their service weapons, some of which may have been visible. (R&R at 4.)

As to the first *Griffin* factor, the R&R found that Cigolo knew she did not have to speak to officers and that the officers repeatedly told her the conversation was voluntary. (R&R at 21–22.) Cigolo argues this was in error because the officers told her they wanted to discuss her brother's shooting and did not tell her that they were investigating her for a crime. This argument misses the aim of the first factor, which does not look at the intent of the officers in initiating the interview. Rather, it focuses on whether the defendant was informed of the voluntary nature of the interview, her ability to terminate the interview, and whether she was considered under arrest. *Griffin*, 922 F.2d at 1349. All of those elements are satisfied here. As the R&R noted, Cigolo was informed multiple times throughout the interview that she was not under arrest and the interview was voluntary.

---

[1] The transcript of the hearing on the motions is found on the docket at ECF Nos. 62 and 63. Because the transcript is consecutively paginated, the Court refers to the transcript page numbers rather than to the specific docket numbers.

(R&R at 21–22.) Indeed, when Cigolo suggested the interview was not voluntary, the officers clarified that she felt compelled to cooperate with them because she wanted to help her family, not because she believed the officers were requiring her to participate in the interview. (*Id*. at 6, 21.) Further, Sargent Lepinski testified that when he initiated the interview, Cigolo was not a suspect, and thus the officers could not have told her as much. (Tr. at 40.) The Court thus concludes that the first factor weighs in favor of finding the interview noncustodial.

As to the second factor, Cigolo argues that a reasonable person would not believe she had unrestrained freedom. When assessing this factor, the Court looks at whether a defendant was prevented from moving in any way or whether the officer's placement during the interview amounted to a threat or intimidation. *United States v. Laurita*, 821 F.3d 1020, 1025 (8th Cir. 2016) (analyzing whether defendant was prevented from moving); *United States v. Hammerschmidt*, No. 15-CV-86(1) (DSD/JSM), 2015 WL 5313513, at *2 (D. Minn. Sept. 9, 2015) (analyzing whether agent's position during the interview was "tantamount to a non-verbal threat or physical intimidation" when defendant did not request to move). Here, Cigolo does not assert that she requested or was prevented from moving; rather, she argues that she was intimidated by the five officers sitting in a circle in her living room. She provides no argument about how the seated officers' placement amounted to a threat or intimidation. Without more, the Court cannot conclude that Cigolo was deprived of her freedom of movement due to the officers'

4

placement. *See United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006) ("Because the record is thin, we believe that it is impossible to determine if [the defendant] retained his freedom of movement throughout the questioning.") Thus, this factor does not weigh in favor of finding a custodial interview.

As to the third factor, the R&R found that Cigolo voluntarily acquiesced to the request for an interview. Cigolo objects, arguing that Sergeant Lipinski used Cigolo's trust and her belief that she had to cooperate to help her brother to obtain her consent to the interview. Where, as here, law enforcement initiates contact with an interviewee, a court considers whether the defendant voluntarily acquiesced to the interview. *United States v. Axsom*, 289 F.3d 496, 501 (8th Cir. 2002) (indicating the third prong is disjunctive). Where the interview is "conversational and nice," and the defendant seems to be willingly reciprocating, courts find that the defendant voluntarily acquiesced to the interview. *Laurita*, 821 F.3d at 1025. The Court has reviewed the recording of the interview and concludes that the officers and Cigolo were conversational and pleasant throughout the interview. Further, when Cigolo told officers she felt she had to cooperate to help her brother, the officers clarified that while she may want to comply to help her brother, they were not compelling her. (Gov. Ex. 1 at 8:46–9:24.) As such, Cigolo's participation in the interview was voluntary and this factor does not weigh in her favor.

As to the fourth factor, the R&R found that it weighed in favor of a non-custodial setting because deceptive tactics are only relevant if they impact a reasonable person's

5

perception of her ability to end the interview, and no such tactics impacted Cigolo's perception of her ability to end the interview. *See Laurita*, 821 F.3d at 1026 ("The use of deception is irrelevant unless it relates to a reasonable person's perception of his freedom to depart."). Cigolo objects, arguing that Lipinski's recording of the interview without telling her was a deceptive tactic meant to elicit a confession, and if she had known her statements could have been used later, she would have terminated the interview. Cigolo provides no support for this proposition, and the Court cannot find any. But, assuming that the surreptitious use of a recording device was a deceptive tactic, the record does not support Cigolo's claim that Lepinski recorded the conversation with the intent to elicit a confession. Lepinski testified that it is his practice to record conversations to accurately capture the information conveyed and that he followed the practice in his conversation with Cigolo. (Tr. at 23:14–24:4.) There is nothing to suggest that he recorded the conversation with the intent to elicit a confession; in fact, the record reflects the opposite: Lepinski testified that when he initiated the interview and when he began recording he did not consider Cigolo a suspect in any crime. (Tr. 16:9–11.) Further, with or without the recording, Lepinski would have been able to testify about the interview with Cigolo. As such, the fourth factor weighs in favor of finding a non-custodial interview.

As to the fifth factor, the R&R concluded that the interview was not police-dominated to a degree that would make the interview custodial. Cigolo argues that this factor weighs heavily in her favor because there were five officers in her home when only

6

one was necessary, and to hold otherwise would suggest that a custodial interview in a defendant's home "is all but impossible." (ECF No. 70 at 7.) The Court agrees that five officers interviewing a person in her home certainly could have a tone of police domination. But the Court must consider the entire context of the questioning, including the place and length of interrogation. *Griffin*, 922 F.2d at 1353. Casual conversations between a defendant and law enforcement in the defendant's home do not establish a police-dominated atmosphere. *Laurita*, 821 F.3d at 1027; *see also Axsom*, 289 F.3d at 502 ("When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial."). Here, after listening to the entire ninety-minute conversation between Cigolo and the five officers in Cigolo's home, the Court does not find that the conversation was police-dominated. At the start of the interview, only Sergeant Lepinski and two officers were present, but Cigolo agreed to have the other two officers present. The interview has a cordial, conversational tone, and does not sound like the officers are dominating the conversation or the atmosphere. Given all of these circumstances considered together, this factor does not weigh in favor of a custodial interview.

As to the sixth factor, it is undisputed that Cigolo was not arrested at the end of the interview. The Court finds this factor also weighs in favor of finding the interview noncustodial.

The *Griffin* factors are non-exhaustive and whether a defendant was in custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *Czichray*, at 827. But in this case, when considering the factors, the Court concludes that the R&R correctly determined that Cigolo was not in custody during the September 24, 2019 interview and her statements need not be suppressed.

B. *Winston Interview*

Later the same evening of September 24, 2019, the same five officers also interviewed Winston. They came to his apartment unannounced, wearing vests with "police" emblazoned on them.[2] When the officers asked to go inside Winston's apartment, Winston asked if he could first have a minute. (R&R at 8–9; Gov. Ex. 2A at 0:05–18.) The police indicated that they would prefer he did not. (R&R at 9; Gov. Ex. 2A at 0:15–25.) He then let them in. (Gov. Ex. 2A at 0:36–38.) As with Cigolo, Sergeant Lepinski recorded the conversation. (R&R at 8.) The entire interview lasted approximately an hour. The officers interviewed both Winston and his fiancée Jennifer Collier in their living room, and separately interviewed Collier in the bedroom. (*See generally* Gov. Exs. 2A, 2B, 3.) At the end of the interview, Winston was not arrested. Winston moved to suppress the statements arguing they were made during a custodial

---

[2] The testimony as to what type of vests the officers were wearing (e.g., soft vests, ballistic vests, or tactical vests) is inconsistent, but the appearance of the vests is not in dispute, and it does not appear the type of vest is relevant to the resolution of these motions.

8

interview without a *Miranda* warning. The R&R found that when considering the totality of the circumstances under the *Griffin*-factors that the interview was non-custodial and the motion should be denied. Specifically, the R&R found that factors 1, 2, 3, 4, and 6 favor finding a non-custodial setting, and that even if factor 5 did indicate a custodial interview, this factor alone was not enough to outweigh the other factors. Winston timely objected to the R&R arguing that it erred in concluding that factors 2, 3, and 5 do not indicate a custodial interview. (ECF No. 71.) The Court reviews these factors *de novo*.

As to the factors 1, 4, and 6, no party has objected to the R&R's conclusion that these factors weigh in favor of finding a non-custodial interview. The Court agrees.

The R&R concluded that the second factor weighed in favor of a non-custodial setting because although the apartment was small, Winston was free to move about. Winston argues that he had no freedom of movement because he was boxed in on the couch while surrounded by five officers. Like Cigolo, Winston did not ask to move about and was not prevented from moving. Thus, like Cigolo, at best this factor is neutral because it is not possible to assess whether Winston was deprived of his freedom of movement during the interview. *See Ollie*, 442 F.3d at 1138 ("Because the record is thin, we believe that it is impossible to determine if [the defendant] retained his freedom of movement throughout the questioning.") Thus, this factor does not weigh in favor of finding a custodial interview.

As to the third factor, the R&R found that this factor weighed in favor of finding the interview non-custodial because Winston voluntarily acquiesced to officer questioning. Winston contends that he first attempted to resist the interview when he asked if the officers "could give him a second" before allowing them into his home, and again resisted when he declined to allow the officers to search his home. The Court, after reviewing the audio of the interview, cannot conclude that these two statements amount to resistance. To the contrary, the statements are consistent with the Eighth Circuit's definition of voluntary acquiescence.

The Eighth Circuit has found that voluntary acquiescence does not mean active cooperation. *See Czichray*, 378 F.3d at 829 (citing *Webster's Third New Int'l Dictionary* 18 (2002) ("passive assent or submission"); 1 *Shorter Oxford English Dictionary* 20 (5th ed. 2002) ("Silent or passive assent to, or compliance with, measures or proposals")). Rather, when a defendant is friendly and cooperative during the interview, his actions are sufficient to find the interview non-custodial under the third factor. *See Axsom*, 289 F.3d at 502 (finding historical facts established the presence of the third mitigating factor where defendant "was extremely friendly and cooperative during the interview"). In addition, when a defendant is informed of his right to terminate the interview and does not do so, courts conclude that the defendant voluntarily acquiesced to the questioning. *E.g.*, *Czichray*, 378 F.3d at 829 ("Against a backdrop of repeated advice that he was free to terminate the interview, [defendant's] decision not to terminate the interview and to

allow the interview to proceed to its closing suggests an exercise of free will, rather than a restraint to a degree associated with formal arrest.").

After reviewing the recording of the interaction, the Court concludes that Winston's cooperation with the officers may not amount to active cooperation, but it did not fall below the standard of voluntary acquiescence. He was generally friendly and cooperative, including when he allowed the officers into his home after the officers explained they would prefer that he not close the door before letting them in because they were concerned for their safety. Winston expressed that he had nothing to hide and for the officers to "go ahead and ask what you gotta ask." (Gov. Ex. 2A 7:35–46.) Winston was also advised that he did not have to talk to the officers. (R&R at 9–10 (citing Gov. Ex. 2A at 1:03–04, 1:31–37).) Winston's argument that he declined the officers' request to search his home cuts in favor of finding voluntary acquiescence because it demonstrates that he was aware of his legal rights and chose to exercise his right to deny consent to the search but did not exercise his right to deny consent to the interview. As such, the Court agrees with the R&R that the third factor indicates a non-custodial interview.

Finally, as the R&R noted, and like Cigolo, the fifth factor—whether the interview was police-dominated—is the closest issue here. Contrary to Winston's objection, the R&R did not conclude that the interview was not police dominated; rather, it concluded that "even if the atmosphere were police-dominated, this is not dispositive of whether Winston was in a custodial setting." (R&R at 29.)

11

"The ultimate question in determining whether a person is in 'custody' for the purposes of *Miranda* is 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Czichray*, 378 F.3d at 826. As noted above, although the *Griffin* factors guide a court's analysis, custody cannot be resolved merely by counting up the number of factors on each side of the balance." *Id.* at 827. "Where a suspect is questioned in the familiar surroundings of his home, and informed several times of his right to terminate the interview at will," the Eighth Circuit requires that "strong evidence of restraint on freedom of movement of the degree associated with a formal arrest is necessary to overcome the natural inference that such questioning is non-custodial." *Id.* at 830.

Here, Winston has not provided strong evidence of restraint. The undisputed record establishes that Winston was in his own home with his fiancée, he was advised he did not have to speak with the officers and was free to move about the apartment, he was told the police did not intend to arrest him at that time, and he was not arrested at the end of the interview. Looking at the totality of the circumstances, even if the interview was police-dominated, the Court cannot conclude that the interview was custodial. As such, the Court overrules Winston's objections to the R&R's conclusion that he was not in custody. *See, e.g., Czichray*, 378 F.3d at 830 (finding a defendant was not in custody when the FBI interviewed him for seven hours in his own home where the FBI instructed him not to use the phone and told him they would "light up his world" if he did not

12

cooperate with the investigation, but defendant was able to move about his home and was informed that he could end the interview).

## II. Winston's Motion to Suppress Evidence

Winston also moves to suppress the contents of a safe the officers discovered in his apartment. (ECF No. 33.) The safe was discovered when the officers, including Special Agent Labno, interviewed Collier separately in the bedroom. (R&R at 12–14.) Labno saw the safe in the bedroom closet during Collier's interview. (*Id.*) Collier told the officers the safe was empty but locked. (*Id.* at 15.) The officers went to the living room to ask Winston about the safe and he agreed to get the key. (*Id.* at 16.) Winston retrieved the key, but the safe was not locked and Winston opened it. (*Id.*) The safe contained a plastic gun case, black ski mask, trigger lock, and loaded magazine matching the brand of the gun that Cigolo had purchased. (*Id.* at 17 (citing Tr. 66:4–67:5, 117:19–21, Gov. Ex. 4 at 1, 2, 3, 4, 5, 9, 10).) The R&R recommends that Winston's motion to suppress be denied.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV; *United States v. Rower*, 878 F.3d 623, 628 (8th Cir. 2017). And "[w]arrantless searches inside a home are presumptively unreasonable." *United States v. Quarterman*, 877 F.3d 794, 797 (8th Cir. 2017) (citation and quotation marks omitted). But, "[o]bserving objects in plain view violates no reasonable expectations of privacy." *United States v. Banks*, 514 F.3d 769, 773 (8th Cir. 2008) (citing *Horton v. California*, 496 U.S. 128, 133 (1990)).

13

The plain-view exception does not extend to when an officer "manipulate[d] the physical environment within the home with the intent to uncover information." *United States v. Trower*, 285 F. App'x 321, 323 (8th Cir. 2008) (per curiam). It is undisputed that resolution of this motion to suppress is a matter of credibility on the issue of the officer's alleged manipulation of the physical environment. At the motion to suppress hearing, Collier testified that the closet doors were open but the safe was not visible and that Labno only saw the safe after opening one of the closet doors wider with his index finger. (R&R at 16.) Labno, on the other hand, testified that the closet door was ajar, and he could see the safe through the gap. (*Id*. at 14.) The R&R found Labno's testimony more credible and laid out its reasoning. (*Id*. at 31–34.) Winston objects to this credibility finding. The parties agree that if the Court were to find Collier's testimony credible then the discovery of the safe would be a violation of the Fourth Amendment, but if the Court were to credit Labno, there would be no violation.

Where a party objects to an R&R's credibility determination, a court must conduct a *de novo* review and make its own credibility determination. *United States v. Jackson-Bey*, No. 17-CR-152(JNE/HB) (1), 2018 WL 2305673, at *1 n.2 (D. Minn. May 21, 2018) (collecting cases). After reviewing the transcript of the hearing, the recording of Collier's interview, photos and other evidence, the Court concludes that Labno's testimony at the hearing is more consistent with the recording from the interview, and as a result, credits his version of events.

Winston correctly points to inconsistencies with Labno's testimony, but they do not change the Court's determination that his testimony is more consistent with the recording than Collier's testimony. For example, while Labno testified that Collier was erratic during the interview, he could give no examples of this erratic behavior, and Special Agent Myer, who also testified about the interview, did not consider Collier's behavior to be erratic. (ECF No. 71 at 15–16 (citing Tr. at 108–09, 121–22, 140–41).)

Winston alleges other inconsistencies in Labno's testimony that are not inconsistent based on the record before the Court. For example, Collier argues that Labno testified that the door to the closet was wide open, which meant that the safe could have been seen from any vantage point, but that Myer did not see the safe until he traded places with Labno. But, as the R&R found, "[i]t is undisputed that the safe was partially obscured by the door," and both Myer and Labno testified that they were able to see the safe behind the door only when standing in the far corner of the room. (R&R at 32.) This is not inconsistent with Collier's testimony that the safe was behind the closet door and that the door was partially open when the officers were in the room.

Although Collier's testimony is credible in some respects, as the R&R noted, there are some glaring inconsistencies between her testimony and the recordings from that night. Because of these inconsistencies, the Court does not credit her version of events. For example, Collier testified that Labno used his own flashlight to look around the bedroom and used it to lift up Collier's comforter to look at her bed and to look in the

15

closet. (Tr. at 152–53.) In contrast, Labno testified that he did not have a flashlight and had to borrow Myer's flashlight. (Tr. at 123.) Labno's testimony is supported by the recording of Collier's interview, which includes his request for Myer's flashlight. This conversation is reflected in the recording. (*See* Gov. Ex. 3 at 2:55–3:00.)

Importantly, Collier testified that after Labno used the flashlight to raise her comforter, she explained to him that the bed was an air mattress, that the apartment complex had bed bugs, and that she did not trust her neighbors. (Tr. at 162.) No such conversation is reflected on the recording.[3] Further, Collier's comments and tone during the interview are not consistent with her testimony she was upset at Labno's actions. To the contrary, her demeanor in the recording appears conversational. After full consideration of the record, the Court concludes that Agent Labno's testimony is more credible and does not find a Fourth Amendment violation. The Court thus overrules Winston's objections.[4]

---

[3] The Government admits that some parts of the conversations the officers had with Winston and Collier are not on the recordings, including a brief conversation Myer and Labno had with Collier before entering the bedroom. (*See* ECF No. 73 at 7 n.1 (noting that a continuous recording of the encounter does not exist).) There is no indication that any part of the conversation is missing between Labno's request of Myer for the flashlight and his discovery of the safe. (*See generally*, Gov. Ex. 3 at 2:55–3:45 (recording from when Labno asks to borrow the flashlight until Collier begins discussing the safe).)

[4] Like the R&R, the Court does not reach the alternative argument by the Government that Winston's opening of the safe was an intervening act that removed the taint of any possible Fourth Amendment violation.

16

The parties do not object to any other aspect of the R&R. The Court determines whether the recommendations are clearly erroneous or contrary to law when no objection has been made. *See* Fed. R. Crim. P. 59; *Grinder*, 73 F.3d at 795. Having reviewed those portions of the R&R to which the parties have not objected, the Court finds no clear error.

## CONCLUSION

Based on all the files, records, and proceedings herein, the Court OVERRULES the defendants' objections (ECF Nos. 70, 71), and ACCEPTS the R&R (ECF No. 68). Accordingly, IT IS HEREBY ORDERED THAT:

1. Defendant Winston's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 33) is DENIED;

2. Defendant Winston's Motion to Suppress Statements, Admissions, and Answers (ECF No. 34) is DENIED; and

3. Defendant Cigolo's Motion to Suppress Defendant's Statements (ECF No. 42) is DENIED.

Dated: June 26, 2020                                BY THE COURT:

                                                    s/Nancy E. Brasel
                                                    Nancy E. Brasel
                                                    United States District Judge