UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 19-272 (NEB)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) GOVERNMENT'S SENTENCING ) MEMORANDUM |
| SEQUANA CIGOLO, | ) ) ) |
| Defendant. | ) ) |

The United States of America, by and through its attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, and Nathan H. Nelson, Assistant United States Attorney, hereby respectfully submits its position and memorandum on sentencing.

## BACKGROUND

### A.   Factual Background

On July 11, 2019, defendant Sequana Cigolo purchased an SCCY CPX-2 9mm semi-automatic pistol from Bill's Gun Shop & Range. (PSR ¶ 10). In purchasing the firearm, defendant filled out the required paperwork declaring that she was purchasing the gun for herself, and was not prohibited from possessing the gun for any reason. (PSR ¶ 10). These declarations were false. She was not purchasing the gun for herself, and she was prohibited from purchasing and possessing firearms because she was an unlawful user of marijuana. (PSR ¶ 10). In truth, defendant was purchasing the gun on behalf of—and at the request of—her co-defendant Jason Winston. (PSR ¶ 13). Winston was the cousin of defendant's then-boyfriend Michael Gresham, and Winston was unable to purchase the gun

for himself due to his criminal record. (PSR ¶ 13; *see also* Ex. 1 at 1:11:30-1:12:00[1] (discussing defendants' knowledge that Winston was a felon)). Defendant admitted that Gresham and Winston were present when she purchased the gun but remained outside the store. (Ex. 1 at 48:18-49:00, 1:02:25-1:03:53). Winston reimbursed defendant for the purchase of the firearm, along with about $50 for her participation. (PSR ¶ 19; *see also* Ex. 1 at 1:09:20-1:10:35).

At some point, not long after receiving the firearm from defendant, Winston gave the gun to Gresham. (PSR ¶ 13). As discussed in more detail below, there are conflicting accounts as to the precise circumstances of the transfer of the gun to Gresham. In any case, however, on July 28, 2019, Gresham came to defendant's house with the firearm, and used it to shoot six times at defendant's brother, L.B., wounding him.[2] (PSR ¶ 11). Gresham then fled to Chicago for an unknown period of time until he was arrested in late August at the Minneapolis airport. (PSR ¶ 11). No firearm was recovered from Gresham, but he was ultimately convicted for the shooting of L.B. and sentenced to 60 months imprisonment for Second Degree Assault. (PSR ¶ 11; Hennepin Case No. 27-CR-19-18627).

On September 18, 2019, the SCCY firearm resurfaced in Chicago when a person (initials M.B.) used the firearm to shot a woman in the back, ultimately leaving her paralyzed. (PSR ¶ 12). A few days later, police located M.B. and attempted to arrest him

---

[1] Citations to exhibits are to the government's motions hearing exhibits, previously provided to the Court.

[2] The SCCY firearm was linked to the various shootings discussed in this memorandum through the use of ballistics (or toolmark) analysis of discharged cartridge casings.

on a separate arrest warrant. (PSR ¶ 12). During the attempted arrest, M.B. fired the SCCY firearm at officers, striking one officer three times before fleeing. (PSR ¶ 12). Several hours later, police found M.B., and M.B. again used the SCCY firearm to fire at police. (PSR ¶ 12). Officers exchanged gunfire with M.B., ultimately striking and wounding him before placing him under arrest. (PSR ¶ 12). The SCCY firearm was recovered, leading to the discovery that defendant had been the purchaser of that firearm a little over two months earlier, as well as the discovery that the same firearm had been used in the shooting of defendant's brother.

On September 24, 2019, investigators interviewed defendant at her house. During the interview, defendant initially gave false statements and theories to police about what had happened with the SCCY firearm after she purchased it. (*See* Ex. 1). Defendant ultimately admitted, however, that she had bought the gun for Winston and given it to him, which was later corroborated through Winston's own admissions as well as the recovery of accessories for the SCCY firearm recovered from Winston's house. (PSR ¶ 13).

### B. Procedural History and Presentence Report

The defendant pleaded guilty to Count 1 of the Indictment charging her with False Statement During the Purchase of a Firearm. (ECF 82-83). On September 9, 2020, U.S. Probation issued a presentence investigation report ("PSR") in this matter. (ECF 93). Consistent with the parties' plea agreement, the PSR found a base offense level of 14, based on the defendant being a prohibited person at the time she committed the offense and committing a straw purchase with reason to believe the offense would result in the transfer of the firearm to a prohibited person. (PSR ¶ 24). After factoring in an adjustment for

3

acceptance of responsibility, the PSR calculated a total offense level of 12, together with a criminal history category of I, resulting in an advisory Guidelines range of 10-16 months' imprisonment.  (PSR ¶¶ 31-32, 46, 93).  The parties have no objection the PSR or the Guidelines calculations contained therein.

## POSITION ON SENTENCING

The only issue before the Court is what constitutes a reasonable sentence in light of the factors enumerated in Title 18, United States Code, Section 3553(a).  In fashioning a sentence, Section 3553(a) requires the Court to consider the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense; the need for deterrence; the need to protect the public from further crimes of the defendant; and the need to avoid unwarranted sentencing disparities.  18 U.S.C. § 3553(a).  For the reasons stated below, a consideration of the factors listed in 18 U.S.C. § 3553(a) supports a custodial sentence.

The nature of defendant's offense is very serious.  The defendant's so-called "straw purchase" of the SCCY firearm set in motion a chain of events that unleashed a tremendous amount of violence in just over two months.  As discussed above, defendant's firearm was used to shoot three people—L.B., a woman in Chicago, and a police officer—undoubtedly changing the lives of those people forever.  While the government agrees that defendant did not specifically *intend* for this violence to occur, this case is a vivid example of the dangers that accompany the straw purchase of firearms.  And although the vast majority of the culpability for that violence falls on those who pulled the trigger (Gresham and M.B.), defendant bears at least some responsibility for playing an integral role in allowing a deadly

4

weapon to get into the hands of people who should never have had it. Even if defendant believed that she was simply purchasing the firearm for Winston for a benign reason (like self-defense), she had abundant reasons to believe that harm could result from her actions. In addition to the illegitimate nature of the straw purchase itself (and the fact that ill ends often result from ill means), defendant admitted she had at least reason to believe that Winston was prohibited from having the gun based on his criminal record.

Moreover, as the Court is aware, there are some conflicting accounts as to the circumstances under which the firearm was transferred to Gresham. Winston stated at his change of plea hearing that defendant was *present* when he gave the firearm to Gresham, and that defendant had even communicated to Winston in some manner that he should give the gun to Gresham because she wanted the gun back. If true, this would be highly concerning because defendant knew Gresham had been previously convicted of a violent felony, specifically 2nd Degree Assault, for the shooting of Gresham's own brother. (Hennepin County Case No. 27-CR-15-19037; Ex. 1 at 11:05-11:55, 39:08-39:40, 49:20-52:00). Defendant also knew Gresham to have mental health issues and described him at one point as "trigger happy." (Ex. 1 at 19:12-20:30, 23:50-24:30). In other words, defendant's culpability for the resulting violence increases the greater role she played in putting the firearm into the hands of a person such as Gresham. Defendant's account, on the other hand, is that she never saw the gun again after giving it to Winston.

This case is based largely on the accounts of defendant and Winston, so it is difficult to know for certain the exact circumstances of the transfer of the firearm to Gresham. However, even accepting as true defendant's claim that she never saw the gun again after

giving it to Winston, the government believes that defendant had at least *some* cause to believe that the gun might end up in Gresham's hands. By defendant's own admission, Gresham had some involvement in the arranging the "straw purchase" of the firearm. In addition to be outside the store when the gun was purchased, Gresham helped facilitate the purchase by sending defendant pictures of the guns that Winston wanted. (PSR ¶ 13; Ex. 1 at 1:16:40-1:17:20). Defendant knew Winston and Gresham to have a close relationship, stating that they are "super tight, they talk all the time." (Ex. 1 at 1:11:10-1:11:15). Defendant also recounted a time in the past when Gresham asked her to purchase a gun for him when she got her permit to carry. (Ex. 1 at 24:10-24:30). Under these circumstances, defendant cannot claim it was totally unforeseeable to her that Gresham would end up possessing the gun at some point.

The United States acknowledges, however, that the seriousness of the offense is mitigated somewhat by other factors. First, a unique circumstance in this case is the fact that some of the harm of defendant's criminal conduct fell upon her own family in the form of the shooting of her brother, L.B.—a person for whom defendant has deep affection and would not want to see harmed. Second, the goal of deterring defendant from future crimes is already partially accomplished by her guilty plea in this case, as defendant will be incapacitated from purchasing or possessing additional guns in the future by virtue of her plea to a felony offense in this matter. Third, while defendant initially gave false statements to the police, she ultimately admitted to purchasing the firearm on behalf of Winston. While the government cannot certify that defendant has truthfully told investigators everything she knows about the offense, the fact remains that—given the nature of the

evidence in this case—it is possible she never would have faced consequences for her crime had she not done the right thing and voluntarily admitted her wrongdoing.

In terms of the history and characteristics of the defendant, she has some criminal history related to theft and driving offenses that—while by no means egregious—is more serious than typically seen in people falling into Criminal History Category I.  (*See* PSR ¶¶ 36-44; *see also* PSR ¶ 47).  The United States also acknowledges the information in the presence report that defendant has had a turbulent and sometimes abusive relationship history, is described as a caring mother of her two young children (ages 2 and 8), and has struggled with mental health issues.

In sum, the government acknowledges the presence of significant mitigating factors in this case, but such factors must be balanced against the aggravating nature of the offense and need for the punishment to recognize the substantial violence and harm that defendant played a role in bringing about.  Given these constellation of mitigating and aggravating factors, the government believes that defendant's request for probation is inappropriate and a custodial sentence is necessary to serve the purposes of punishment.  A custodial sentence accounts for both the mitigating and aggravating aspects of defendant's personal history, while at the same time reflecting the seriousness of the offense, promoting respect for the law, providing just punishment for the offense, affording adequate deterrence, and protecting the public from further crimes of the defendant.

## **CONCLUSION**

For all the foregoing reasons, the United States respectfully recommends that the Court deny defendant's request for a probation and impose a custodial sentence.

Respectfully submitted,

Dated: <u>October 20, 2020</u>

ERICA H. MacDONALD
United States Attorney

<u>*/s/ Nathan H. Nelson*</u>

BY: NATHAN H. NELSON
Assistant U.S. Attorney
Attorney ID No. 0388713